[Criminal No. 498.    Filed March 12, 1921.]

[196 Pac. 159.]

## HARRY HURLEY, Appellant, v. STATE, Respondent.

1. LARCENY—INSTRUCTIONS ERRONEOUS, AS IGNORING CRIMINAL INTENT, AN ESSENTIAL ELEMENT OF "LARCENY."—In view of Penal Code of 1913, section 20, in a prosecution for larceny of cement from the state, defendant claiming he had borrowed the cement from the state highway department's employee, and had returned it, instructions predicated on the idea that, if the highway department's employee had no authority to lend the cement to defendant and defendant knew the fact, he could not successfully defend on the ground that he actually had the employee's consent, *held* erroneous, as ignoring the criminal mind or intent that must always be present to constitute larceny; "larceny" being the felonious taking by trespass and carrying away of the goods of another without the latter's consent, and with the felonious intent per-

manently to deprive the owner of his property and to convert it to the taker's use.

2. LARCENY—BORROWER OF CEMENT NOT GUILTY, THOUGH EMPLOYEE UNAUTHORIZED TO MAKE LOAN.—Where it was the custom of the state highway department to lend cement to responsible contractors, if defendant so borrowed cement from an employee of the department, doing so in good faith, and with the honest purpose to repay the loan on demand, or when needed, defendant was not guilty of larceny, simply because the employee of the department with whom he dealt had no authority in law or fact to make the loan.

3. CRIMINAL LAW—INSTRUCTIONS CONFLICTING ON POINT OF CRIMINAL INTENT ERRONEOUS.—In a prosecution for larceny, instructions in conflict, in that some of them ignored the element of criminal intent, while others emphasized it, were erroneous, as misleading and affording the jury no definite guide.

4. LARCENY—WEIGHT, CREDIBILITY, AND SUFFICIENCY OF EVIDENCE ENTIRELY FOR JURY.—The weight, credibility, and sufficiency of the evidence in a prosecution for larceny is a question entirely for the jury.

5. LARCENY—DEALINGS BETWEEN OWNER OF PROPERTY AND DEFENDANT MAY BE SHOWN ON ISSUE OF LOAN OF PROPERTY TO ACCUSED.— In a prosecution for larceny of cement from the state, defendant claiming that he borrowed it pursuant to custom from an employee of the state highway department, the course of dealing between defendant and those in charge of the state's property, including other transactions of a similar nature taking place about the same time, as a prior borrowing by defendant of certain rolled barley from the state engineer, could properly be shown to throw light on the relations and intentions of the parties in so dealing with the state's property, and as an aid to the jury in determining the probable truth of the defense.

APPEAL from a judgment of the Superior Court of the County of Maricopa. R. C. Stanford, Judge. Reversed and new trial granted.

Mr. W. L. Barnum, for Appellant.

Mr. W. J. Galbraith, Attorney General, Mr. Geo. R. Hill and Mr. Wm. A. Harkins, Assistant Attorneys General, and Mr. L. M. Laney, County Attorney, for the State.

PER CURIAM.—From a judgment of conviction upon a charge of stealing twelve hundred sacks of cement, of the value of twelve hundred dollars, the property of the state of Arizona, the defendant appeals.

The facts are that in 1919 the state was engaged in road construction, and in such work it was using quite a large amount of cement. The road work was under the supervision of the state engineer, with subordinates who had immediate charge and control of the state's property used in such work. In May, 1919, several carloads of cement were shipped to the state authorities from El Paso, Texas, to Tempe, Arizona, and paid for by the state. These shipments, or some of them, were receipted for to the railroad company by one W. E. Springer, a timekeeper on a piece of road construction between Tempe and Phoenix, and who also had authority, as the testimony shows, to make purchases for camp, to check deliveries of food, equipment, and stuff coming to the camp.

On or about May 20th, defendant employed one D. O. Butts, in the truck business in Phoenix, to go to Tempe and haul to his ranch or home, on South Fifteenth Avenue, in Phoenix, some cement to be taken from a car at Tempe, the number of which was given him by defendant. He got one hundred and twenty-five sacks on this trip. The next day he hauled two hundred and fifty sacks. On each trip two trucks were employed, with drivers and helpers. On both trips the trucks arrived at the car where the cement was to be loaded just about or a little before dark. About the same time G. I. Binckley, of Phoenix, and his son and another boy, hauled one hundred and forty or one hundred and forty-five sacks from the same place to defendant's ranch on South Fifteenth Avenue. They arrived at Tempe in daylight, but it was dark before they left on their return.

On May 27th defendant rented from A. F. Wolf a warehouse in Tempe, for the purpose of storing some cement, and the next day J. J. Butts, whom defendant had employed, with three others, moved from a car—the number of which had been given him by defendant—some 1,197 sacks of cement, and put them in the Wolf warehouse, where they remained until October 27, 1919. All told, defendant had taken from the railroad cars at Tempe, 1,700 sacks of cement, the property of the state. The employment of draymen to do the hauling, the taking of the cement from the cars, and the transferring it to defendant's ranch on Fifteenth Avenue, and to the warehouse in Tempe, were all done openly and with no apparent effort at secrecy. The defendant used 350 sacks of the cement that were hauled to his place in constructing water tanks and sidewalks.

Defendant's explanation of this rather remarkable transaction is that he intended to put up on his ranch a silo and tanks, and that he borrowed the 1,700 sacks of cement from W. E. Springer for that purpose, with the agreement to return it "when they started the Mesa-Tempe job"; that the reason he did not use the car of cement stored in Tempe was because he was dickering with some parties to sell his ranch, and for that reason he "hesitated putting $3,000 or $4,000 in it."

Thomas Maddock, the state engineer at the time, testified that, when Springer informed him that he (Springer) had loaned the cement to defendant, he wrote defendant the following letter:

"October 12, 1919.
"Mr. Harry Hurley,
      "526 East McDowell St.,
            "Phoenix, Arizona—
"Dear Sir: Mr. W. E. Springer, who is leaving the employment of the state highway department, to-day

informed me that he loaned 1,700 sacks of cement from our supply in May, which have not yet been returned. As we are starting construction on Mesa-Tempe work, we will need the cement in the immediate future. Please arrange for its early delivery to Mr. J. M. Brown, our engineer in charge of this work.

"Respectfully yours,
"THOMAS MADDOCK,
"State Engineer."

—and received from defendant the following reply:

"Phoenix, Ariz., Oct. 14, 1919.

"Mr. Thomas Maddock,
"State Engineer,
"Phoenix, Arizona—

"Dear Sir: Replying to yours of recent date relative to cement loaned to me from the state supply, beg to advise that, as per your instructions, I will see Mr. Brown, your engineer in charge of the Tempe-Mesa work, and arrange to deliver same to him at the place and at the time designated. Thanking you for the courtesy you have extended by your department, I am,

"Very truly yours,
"H. L. HURLEY."

The defendant, after paying storage charges for five months on the carload lot at Tempe, returned it to the state on October 17, 1919, and on January 20, 1920, repaid to the state the balance of the 1,700 sacks he had taken, as is evidenced by the following receipts:

"Tempe, Ariz., Oct. 17, 1919.

"Received of Harry Hurley 1,190 sacks of El Toro cement in A. F. Wolf's warehouse in Tempe, storage on same to be paid by Harry Hurley until removed by the state highway department.

"JAMES M. BROWN,
"Construction Engineer."

"Tempe, Ariz., Jan. 20, 1920.
"State of Arizona Highway Department.

"Received of Harry Hurley memorandum receipt for 512 sacks of cement from J. D. Halstead Lumber Company, to be delivered at warehouse at 201 West Fifth street, Tempe, by January 31, 1920, for balance of 1,700 sacks loaned Harry Hurley.

"JAMES BROWN,
"Construction Engineer."

It appears the habit or custom of loaning cement and other property of the highway department of the state was quite common. The state engineer's testimony in that regard was:

"I did not give instructions to loan anything unless it is imperative, and in an emergency we borrow and lend. It had been the policy of the department to borrow and lend before I took charge. As far as this cement is concerned, I will say frankly, if we had it on hand at the end of a job, we would loan to a responsible person short in the construction business; we would lend to them, and we have borrowed. I have tried to cut it down to the minimum. I only know by report of a loan to the Halstead Lumber Company on the 5th of January, 1919, there was other material loaned by the department prior to the time that I went in there; matters about the loaning of stuff never reached me ordinarily until some question is raised about it. I know of no record in the engineer's office showing the loan of a carload of cement to the Halstead Lumber Company that was afterwards returned. I think it was a carload of cement that had been loaned to the Halstead Lumber Company. I know there was two transactions. I think the first was a carload and the next a truckload. I authorized the subordinates to loan. I authorized a loan to the Nash people of some springs for trucks."

Springer was sworn as a witness for the state, and refused to answer the question whether he had or had not loaned the cement to the defendant, upon the

ground that "it might incriminate me." He did say
that he told State Engineer Maddock that he had
loaned the defendant the cement and that he told him
without any prompting or request from defendant.

Defendant has assigned several errors. One is
that the court erred in giving the following instruc-
tion:

"In this behalf I instruct you that if the employee,
W. E. Springer, gave the defendant permission to
take the cement in question, and if the defendant at
the time of the taking honestly believed that such em-
ployee had authority to give such permission, and the
defendant took the cement in question pursuant to
such permission, then there would be no felonious tak-
ing by defendant, and the crime of larceny would not
be made out. In other words, if W. E. Springer gave
the defendant, Harry Hurley, permission to take the
cement described in the information, and if W. E.
Springer claimed or professed to have authority to
give such permission, and the defendant, Harry
Hurley, in good faith believed that said W. E.
Springer had authority to authorize him, the de-
fendant, to take said cement, then the act of taking
would not amount to larceny. On the other hand,
however, if the defendant, Harry Hurley, at the time
of the taking of the cement in question, had reason to
know and did know that the state employee, if any,
assuming to authorize the taking (had no authority),
then the defendant cannot successfully defend on the
ground that he actually had the consent of such em-
ployee."

In this instruction we have supplied the words in
the parentheses, for without them the instruction
would be confused and somewhat unintelligible.
That the instruction, as amended, correctly quotes the
court, we think is evident from a subsequent instruc-
tion in the following words:

"If you should find from the evidence that an em-
ployee or servant of the state of Arizona did give the
defendant, Harry Hurley, permission to take the

cement in question, and that the defendant took the cement pursuant to that permission, still such permission would not constitute a defense to the charge of larceny if the defendant at the time of taking had reason to know and knew that such employee or servant had no authority to consent to the taking.''

The above instructions are predicated upon the idea that if Springer had no authority to lend the cement to defendant, and defendant knew that he had no such authority, then defendant could not successfully defend on the ground that he actually had Springer's consent, and ignore the criminal mind or intent that must always be present in larceny. The instructions would be very appropriate, if the defendant were being sued by the state in conversion; but it too narrowly limits defendant's rights of defense in a prosecution for larceny. We know of no law authorizing any officer or agent or employee of the state to lend the state's property with the understanding that it or an equal quantity of the kind be later returned. Such a transaction, though contrary to law, does not necessarily impute moral turpitude. It would, of course, be illegal, and all participants therein would incur civil liability to the state; but, in order to make them guilty of the crime of larceny, there must exist a felonious intent. This the instruction completely ignores.

Larceny is defined as:

''The felonious taking by trespass and carrying away of the goods of another, without the consent of the latter, and with the felonious intent to permanently deprive the owner of his property, and to convert it to his, the taker's, own use.'' 17 R. C. L. 5.

Penal Code, section 20, provides that—

''In every crime or public offense there must exist a union or joint operation of act and intent, or criminal negligence.''

Thus an intent is an essential ingredient to every crime, and in larceny it must be a felonious intent. This intent, as applied to the "taking," means a taking without color of right or excuse, and asportation with intent to convert to one's own use the property of another. *State* v. *Jenkins* (Mo.), 213 S. W. 796. Intent is of the very essence of the crime of larceny, except where it has been dispensed with by some statute.

"Every taking by one person of the personal property of another without his consent is not larceny; and this although it was taken without right or claim of right and for the purpose of appropriating it to the use of the taker. Superadded to this, there must have been a felonious intent, for without it there would be only a bare trespass which, however aggravated, would not be crime. It is the criminal mind and purpose going with the act which distinguishes a criminal trespass from a mere civil injury." 17 R. C. L. 24; *McCourt* v. *People,* 64 N. Y. 583.

Again it is said:

"Felonious intent means to deprive the owner, not temporarily, but permanently, of his own property without color of right or excuse for the act, and to convert it to the taker's own use without the consent of the owner." *In re Mutchler,* 55 Kan. 164, 40 Pac. 283.

In another case it is said:

"In order to constitute larceny there must be not only a taking and carrying away of the goods of another, but there must also exist contemporaneously the felonious intent . . . on the part of the taker, which means a taking without excuse or color of right, with the intent to deprive the owner permanently of his property and all compensation therefor." *Stanley* v. *Prince,* 118 Me. 360, 108 Atl. 328.

The taking of the cement truly was without the legal consent of its owner, the state, because the law

had not authorized any officer, agent, or employee of the state to grant such consent. But, however that may be, the uncontradicted record is that a custom or habit of lending the state's property by the highway department had become quite common. The state engineer said:

"I authorized the subordinates to loan. It had been the policy of the department to borrow and lend before I took charge. As far as this cement was concerned, I will say frankly, if we had it on hand at the end of a job, we would loan to a responsible person short in construction business."

A carload and a truckload of cement had been loaned to another party without making any record of it in the office of the state engineer. While the taking under the arrangement testified to by defendant was without the sanction of law, if the transaction was entered into in good faith and with the honest purpose on the part of defendant to repay the loan on demand or when needed, he would not be guilty of crime simply because the person with whom he dealt had no authority in law or in fact to make the loan. If such were the fact—and that would be a question for the jury—there was no intent upon the part of defendant to permanently deprive the state of its property. There would be absent from the act the criminal mind and purpose necessary to constitute larceny. We think the above instructions are not only erroneous, but they were in conflict with other instructions given by the court. In fact, the court gave, not one, but several, instructions diametrically opposed in meaning to the ones above quoted. For instance, he told the jury:

"And in this connection you are instructed that if the defendant, Harry Hurley, took the cement charged in the information with the knowledge and consent of an employee or employees of the state of

Arizona, who had the same in charge and held the custody of the same for the state of Arizona, with the understanding or arrangement that he was to return the same upon demand, and that the same was taken with the honest intention of returning the same and not with a felonious intent to appropriate the same to his own use, then the defendant would not be guilty of the crime of larceny as charged, and it is your duty to acquit.

"You are further instructed that, if the defendant took the cement charged in the information under an arrangement or agreement with the parties rightfully in possession of the same, with the understanding that the same was to be returned on demand, it is your duty to acquit the defendant, although you may find that the party in whose possession the cement was, and who gave permission to the taking of the same, had no legal right to grant such permission."

This last instruction was unquestionably a correct statement of the law as applied to the facts in this case. If it states the correct rule of law, then the instruction assigned as error misstates the law. They are contradictory and conflicting. The jury retired to consider their verdict with two rules given them by the court—one a correct statement of the law and one an erroneous statement of the law. They therefore had no definite guide. In 14 R. C. L. 777, section 45, it is said:

"Where instructions give to the jury contradictory and conflicting rules for their guidance, which are unexplained, and following either of which would or might lead to different results, then the instructions are inherently defective and erroneous; and this is true, though one of the instructions correctly states the law as applicable to the facts of the case. The reason for this is that, where the instructions on a material point are contradictory, it is impossible for the jury to decide which should prevail, and it is equally impossible, after the verdict, to know that the jury was not influenced by that instruction which was

erroneous, as the one or the other must necessarily be, where the two are repugnant. A further reason is that conflicting and contradictory instructions in effect leave the jury without instructions to guide them with reference to the law arising upon the evidence in the cause."

The text is amply supported by the decisions.

We disclaim any purpose to express any opinion upon the sufficiency of the evidence to sustain a verdict of guilty. Its weight, credibility, and sufficiency is a question entirely for the jury. *Territory* v. *Dowdy,* 14 Ariz. 145, 124 Pac. 894; *Marley* v. *State,* 15 Ariz. 495, 140 Pac. 215. It is the duty of the court to give the jury the rules of law to guide their deliberations and determinations, and these rules must not be at such cross purposes as to confuse and mislead the jury. If the instructions are contradictory upon the main point in question, how is the jury to know which to follow, or which is a correct statement of the law? It will not do to tell the jury in one breath that, if they find Springer had no authority to loan the cement and defendant knew it, he may be found guilty, and in the next breath tell them that if the defendant got the cement from Springer, with an arrangement or understanding that he would replace or return it, he was guilty of no offense. That is in effect what the court did in this case, and in doing so we think left the jury at sea as to what the law in the case was, and committed serious error against the rights of the defendant.

The state, as part of its case, introduced, over defendant's objections, evidence of another transaction similar in character to the one made the basis of this prosecution. It was shown that defendant, in May, 1919, obtained 350 sacks of rolled barley, the property of the state, from the state engineer, through one Mc-Grath, and used it in feeding stock on his ranch at

South Fifteenth Avenue. The evidence is silent as to what McGrath's position was, but the barley was delivered to the defendant by the Tempe Milling Company on orders signed "State Engineer, by T. F. McGrath." It was also shown that defendant, in October, 1919, paid the Tempe Milling Company for 350 sacks of rolled barley, which was credited to the state.

The defendant assigns the admission of testimony of this barley transaction as error, contending, as we understand it, that, if this shows anything, it is that another offense was committed. We think the course of dealing between defendant and those in charge of the state's property, including other transactions of a similar nature, taking place about the same time, may properly be shown for the purpose of throwing light upon the relations and intentions of the parties thus dealing in the state's property, and as an aid to the jury in determining the probable truth or untruth of defendant's defense. *Cummings* v. *State,* 20 Ariz. 176, 178 Pac. 776; *Duff* v. *State,* 19 Ariz. 361, 171 Pac. 133; 8 R. C. L. 201, § 197.

On account of the erroneous instructions given to the jury, the judgment is reversed and the cause remanded, with directions that defendant be granted a new trial.