800 P.2d 1260

**STATE of Arizona,
Appellee/Respondent,**

**v.**

**Jose Jacobo AMAYA–RUIZ,
Appellant/Petitioner.**

**No. CR–86–0095–AP/PC.**

Supreme Court of Arizona,
En Banc.

Sept. 6, 1990.

Reconsideration Denied Dec. 4, 1990.

As Corrected Nunc Pro Tunc
Dec. 14, 1990.

Robert K. Corbin, Atty. Gen. by Jessica G. Funkhouser, Chief Counsel, Crim. Div., Ronald L. Crismon, Diane M. Ramsey, Asst. Attys. Gen., Phoenix, for appellee/respondent.

Jeffrey D. Bartolino, Tucson, for appellant/petitioner.

## OPINION

CORCORAN, Justice.

Appellant Jose Jacobo Amaya–Ruiz (defendant) was convicted, following a jury trial, of first degree murder, manslaughter, theft of property with a value of $1,000.00 or more (a pickup truck), and first degree burglary. The jury found the manslaughter offense to be of a dangerous nature. The court sentenced defendant to death on the murder conviction, 7.5 years' imprisonment for manslaughter, 5 years for theft, and 7 years for first degree burglary. The terms of imprisonment were to run concurrently with the death sentence, but consecutively to each other. Defendant appeals from his convictions and sentences and seeks review of the denial of his petition for post-conviction relief. We consolidated

the two proceedings. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031 and –4033.

### ISSUES PRESENTED

1. Did the trial court err by failing to order additional competency hearings under rule 11, Arizona Rules of Criminal Procedure?

2. Did the trial court abuse its discretion by denying defense counsel's repeated requests for continuances?

3. Was defendant's confession involuntary due to coercion?

4. Was defendant's confession obtained in violation of his rights under *Miranda v. Arizona?*

5. Did the trial court's evidentiary rulings constitute reversible error?

6. Did the trial court err by allowing improper comments in the state's opening statement and closing argument?

7. Were the trial court's jury instructions proper?

8. Did the trial court's rulings at the aggravation/mitigation hearing violate defendant's constitutional rights?

9. Should the trial court's imposition of the death penalty be upheld?

10. Was defendant denied effective assistance of counsel?

11. Was the court's failure to appoint additional experts for defendant's rule 32 post-conviction hearing an abuse of discretion?

12. Did court-ordered editing of defendant's appellate brief violate his constitutional rights?

### FACTS

Defendant, an undocumented alien from El Salvador, was employed as a ranch hand by the victim and her husband, who lived in a sparsely populated area on the east side of Tucson. Defendant lived on the ranch in a structure about 100 feet from the house. He was apparently well liked and trusted by the victim and her husband, who often invited him into their home for dinner and provided him with food and clothing.

On the morning of March 28, 1985, the victim was murdered in her home while her husband was at work. While speaking to her sister on the telephone at approximately 9:00 a.m. that morning, she heard a knock on the door. Immediately after the victim answered the door, her sister, who was still on the line, heard the victim say, "What are you doing? Leave me alone. . . . I will give you the gun." She heard scuffling noises and a man's voice, so she called the police. When the officers arrived less than 10 minutes later, they found the victim dead, stabbed 23 times, with a contact gunshot wound in the ear. No murder weapon was found in the home, but a bloody shoe print was observed less than 2 feet from the body. At the time of the murder, the victim was approximately 4 months pregnant.

While en route to the scene, Lieutenant Lon Bothwell of the Pima County Sheriff's Department saw a pickup truck that apparently had run off the road about 2 miles from the ranch. He made a radio report that he observed a "Mexican-looking male in a baseball cap" walking away from the truck. Further investigation revealed that the truck belonged to the victim's husband and two knives were found in the vehicle.

Soon after discovering the body, police searched the area for the killer. The search focused on defendant, who had been seen watering trees at 7:00 a.m. on the day of the murder, but had disappeared by the time police arrived. The search continued until nightfall, but no suspects were apprehended. Detective Thomas Petropoulos, placed in charge of the investigation, issued a bulletin to law enforcement agencies notifying them to detain defendant.

At approximately 12:15 a.m. on March 29, two officers of the Southern Pacific Railroad Police, Steven Hardy and Kenneth Nelson, apprehended defendant attempting to board a westbound train in the Yuma railroad yard. He was detained with a group of 14 undocumented aliens who were also trespassers on the train, which had just arrived from Tucson. The officers radioed the United States Border Patrol to alert them of the location of the suspected

undocumented aliens. Before Border Patrol officers arrived, Hardy did a quick patdown search of defendant and placed him in his vehicle. He then turned defendant over to Agent Steven Merrill of the Border Patrol.

Agent Merrill performed patdown searches of all the detainees and transported them to the Border Patrol station, where they were requested to empty their pockets and were interrogated as to their alienage. Because defendant spoke no English, Merrill interrogated him in Spanish. Defendant produced a loaded revolver from his pants or belt area, according to Merrill. The serial number on the revolver ultimately was determined to match a gun missing from the victim's home.

After defendant surrendered the gun, Merrill learned that defendant was a suspect in a Tucson murder and read him his *Miranda* rights in Spanish. When asked to sign an acknowledgment, defendant indicated he could not write and signed by mark. He also made his mark on a waiver of rights statement. At that time, defendant declined an offer of food and rest. Defendant had previously indicated he was born in Mexico and wished to be deported as soon as possible. He claimed that he purchased the gun from an unknown person in San Luis, Arizona on the previous day, when he entered the United States.

Det. Petropoulos arrived at the Yuma Border Patrol Station at about 8:30 a.m. He interviewed defendant with the aid of an interpreter, Border Patrol Agent Rudy Rodriguez. The detective identified himself as a law enforcement officer and read defendant his *Miranda* rights. When asked whether he wished to answer any questions, defendant replied, "I don't know if I will answer ... ask me something." Initially, defendant denied knowing the victim's family, but soon admitted he was lying. The detective accused him of stealing the truck, but defendant vehemently denied this, saying he did not know how to drive. Det. Petropoulos then told defendant that two witnesses saw him take the truck and run. Petropoulos later admitted the accusation was untrue.

Next, Det. Petropoulos asked a series of questions about the murder and defendant denied committing the crime. He eventually confessed to the murder after the detective told him the name of the neighbor who allegedly saw him running from the truck and said, "This is your only opportunity to tell the truth. If you lie at this time, it will be on record for the rest of your life." First, defendant reluctantly said, "I didn't do it, but I was drugged," then admitted, "I took her life." Despite admitting he committed the murder, defendant continued to deny stealing the truck. Additionally, he maintained that he was not aware the victim was pregnant.

Defendant was convicted on all counts after a jury trial at which he did not testify. He was sentenced to death for the murder and to terms of imprisonment for the remaining offenses. Defendant timely appealed, and we consolidated the appeal with his petition for review of the trial court's denial of his petition for post-conviction relief.

## DISCUSSION

### 1. *Rule 11*

Defendant argues that the trial court violated his due process rights under the United States and Arizona Constitutions by failing to assure his competency at all stages of the proceedings. He did not raise the defense of insanity at trial. Rather, his argument is based on incompetency to stand trial.

The trial court granted defendant's motion for a hearing to determine competency under rule 11, Arizona Rules of Criminal Procedure. The hearing was held on October 7, 1985, and testimony was given by John LaWall, M.D., a psychiatrist-neurologist chosen by the state, and Daniel B. Overbeck, Ph.D., a psychologist nominated by defendant. Dr. LaWall testified that he conducted a one-hour interview with defendant without formal psychological tests. He concluded that defendant was not so mentally deficient as to be incompetent to stand trial, although he was in the borderline range of intellectual function, with an

estimated I.Q. of 65–75. Dr. LaWall found that defendant understood the function of judge and jury in rough terms, although defendant stated that the role of the judge was to "sentence you to death." To this end, Dr. LaWall noted that tutoring on the criminal justice system might benefit defendant. During the interview, he explained the jury concept to defendant. Dr. LaWall noted that defendant refused to discuss the time period during which the murder occurred. He speculated that defendant was probably advised by other inmates to remain silent, and although further evaluation was potentially beneficial, defendant might "feign ignorance." Also, defendant denied any history of psychological problems.

Dr. Overbeck initially testified that he was unable to reach a conclusion concerning defendant's competency. He said that defendant could meet the standard for competency if he received tutoring about the criminal justice system and showed that he could become actively involved in his defense. When cross-examined by the prosecution, Dr. Overbeck gave a qualified opinion that defendant was competent to stand trial. The court posed further questions concerning the qualification, and Dr. Overbeck opined that, absent tutoring or further counseling, he was "left with an educated estimate that defendant is competent." Based on the expert testimony and its own observations, the trial court ruled that defendant was competent to stand trial.

Following the court's finding of competency, defense counsel, Susan Kettlewell of the Pima County Public Defender's office, made 3 serial motions to continue, seeking a postponement of the trial date in order to tutor defendant about the workings of the United States criminal justice system. The trial court denied these motions. Ms. Kettlewell previously claimed she was unable to effectively tutor defendant because of her lack of fluency in the Spanish language. This obstacle was removed well in advance of trial when Anthony Ramos, a Spanish-speaking attorney, joined her as co-counsel.

Ms. Kettlewell made several motions seeking an additional rule 11 examination, and continually advised the court of defendant's behavior and her belief that he was incompetent. On November 25, 1985, during pretrial motions, she sought another examination into defendant's competency, citing his previous inappropriate courtroom behavior and his lack of understanding of the criminal justice system. At the hearing on a motion to continue on November 13, defendant had spoken loudly in court when asked to waive his speedy trial rights. Several weeks before, defendant had attempted suicide in jail. Defense counsel and the trial court were aware of this suicide attempt at the time of the motion to continue. Additionally, at the hearing on the motion to suppress, defendant refused to waive the attorney/client privilege to allow his former attorney to testify about his lack of understanding of the criminal justice system. The trial court denied the motion.

Ms. Kettlewell again moved for an additional rule 11 examination on November 27—the second day of trial. She told the court that after the previous day's proceedings, defendant asked, "Is it over now?" Additionally, she had received jail records concerning defendant's previous suicide attempt, of which the court was aware. Again, the motion was denied, only to be renewed on December 4, the last day of trial. At that time, Mr. Ramos indicated that defendant had asked, "Who are the people in the jury box?" Additionally, defendant indicated he did not understand when asked if he wished to testify, and inquired whether Det. Petropoulos would question him. The trial court again denied the motion.

■ Due process requires that the state "observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent." *Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975). The inquiry is whether defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and whether he has a rational as well as a

**162**

factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 403, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

■ This court has implemented procedures to assure the competency of criminal defendants. *See* rule 11, Arizona Rules of Criminal Procedure. An accused has the right to a mental examination and hearing where reasonable grounds for an examination exist. *See* rule 11.3. Reasonable grounds exist when "there is sufficient evidence to indicate that the defendant is not able to understand the nature of the proceeding against him and to assist in his defense." *State v. Borbon,* 146 Ariz. 392, 395, 706 P.2d 718, 721 (1985). The trial court has broad discretion in determining whether reasonable grounds exist to order a competency hearing and its decision will not be reversed absent a manifest abuse of discretion. *See State v. Salazar,* 128 Ariz. 461, 462, 626 P.2d 1093, 1094 (1981). Examinations into competency focus "on an extremely narrow issue: whether whatever is afflicting the defendant has so affected his present capacity that he is unable to appreciate the nature of the proceedings or to assist his counsel in conducting his defense." *State v. Steelman,* 120 Ariz. 301, 315, 585 P.2d 1213, 1227 (1978).

■ On appeal, defendant argues that the trial court erred in refusing to grant additional rule 11 examinations, both at trial and on the motion for post-conviction relief pursuant to rule 32. A trial judge is under a continuing duty to inquire into a defendant's competency, and to order a rule 11 examination *sua sponte* if reasonable grounds exist. *See Drope,* 420 U.S. at 181–82, 95 S.Ct. at 908–09; *Bishop v. Superior Court,* 150 Ariz. 404, 407, 724 P.2d 23, 26 (1986). However, the trial court granted defendant's initial motion for a rule 11 examination, and the resulting psychiatric report by Dr. LaWall indicated that defendant's uncooperative attitude might be the result of advice from other inmates, rather than psychological problems. The trial court acted within its discretion in determining that defendant willingly refused to speak to his attorneys or to mental health

professionals about his case. As our court of appeals has stated:

> We think, however, the record shows quite clearly that defendant's unwillingness to cooperate with his attorney was calculated to undermine his prosecution.... Similarly we cannot agree such conduct on the part of the defendant indicates he *could not* cooperate with counsel as opposed to his refusal to cooperate. The testimony of the medical experts overwhelmingly indicates defendant's lack of cooperation was entirely volitional and not the result of a mental defect which affected his competency. "The voluntary actions of the defendant do not provide an excuse in law for his ... irrational conduct."

*State v. Tramble,* 116 Ariz. 249, 253, 568 P.2d 1147, 1151 (App.1977), quoting *State v. Cooper,* 111 Ariz. 332, 334, 529 P.2d 231, 233 (1974) (emphasis in original).

In this case, the trial judge concluded that defendant was malingering based on Dr. LaWall's report and the judge's opinion formed after personal contact with defendant. We note that defendant's prison psychiatrist repeatedly mentioned in defendant's prison records the possibility that his conduct was volitional. We hold that the trial court did not abuse its discretion in refusing defendant's requests for an additional rule 11 examination based on his failure to cooperate with counsel.

■ Similarly, defendant's repeated statements to counsel that he did not understand the proceedings did not require that an additional rule 11 examination be held. Although both medical experts concluded that tutoring about the justice system would benefit defendant, he was afforded ample opportunity to obtain such instruction. Defendant was assisted by two Deputy Public Defenders, one of whom, Anthony Ramos, was fluent in defendant's native Spanish. Mr. Ramos began representing defendant almost two months before trial. The record indicates that defendant refused to discuss his case with Mr. Ramos during their meetings. Clearly, the trial court adequately ensured defendant's competency in this area, and

we will not consider his complaint that he lacked understanding of the United States justice system when this was largely the result of his willful noncooperation. The trial court, aided by its observation of defendant's courtroom behavior and the reports of Drs. LaWall and Overbeck, decided that defendant understood the nature of the proceedings, and we will not disturb that decision absent an abuse of discretion.

■ Defendant further argues that two instances of courtroom outbursts occurring outside the jury's presence required an additional rule 11 examination. Standing alone, conduct intended to disrupt the judicial process is insufficient to require an additional rule 11 examination after an initial determination of competency. *See State v. Taylor*, 160 Ariz. 415, 418, 773 P.2d 974, 978 (1989) (defendant refused to cooperate with mental health experts).

Defendant also contends that his suicide attempts in jail required an additional rule 11 examination. The first two incidents occurred in April and May, 1985, shortly after the March 28 murder. Prison records indicate that defendant attempted to cut his arm with first a plastic comb, then a broken plastic spoon. At the time of the rule 11 examination, neither his counsel nor the appointed doctors were aware of these incidents. The third, most serious incident took place around October 12, shortly after the initial rule 11 hearing. Defense counsel were aware of this suicide attempt, and the trial court was informed soon thereafter. At the rule 32 hearing, defendant introduced prison records not previously available to his trial counsel, reflecting the first two incidents.

■ We note that the last of defendant's suicide attempts took place approximately two months before his trial. The trial judge was aware of the most recent and serious of these attempts, but refused to order another competency examination. The trial court has broad discretion in considering all available information when determining the need for an additional competency examination. In cases where the attempted suicide does "not stand alone," further inquiry into competency may be mandated by due process. *See Drope*, 420 U.S. at 180, 95 S.Ct. at 908 (defendant tried to choke his wife shortly before trial, shot himself while being tried for raping his wife with 4 other men, and had history of bizarre behavior, as evidenced by his wife's testimony and reports of medical experts). As the Supreme Court noted:

> [E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.

*Drope*, 420 U.S. at 180, 95 S.Ct. at 908. Standing alone, a suicide attempt has not been held to mandate a rule 11 examination. Our court of appeals has upheld a trial court's refusal to grant a defendant's motion for a rule 11 examination when he had been found competent after a hearing only three months before in another criminal matter and the only new evidence of incompetency was a recent suicide attempt. *State v. Messier*, 114 Ariz. 522, 562 P.2d 402 (App.1977). Here, the trial court's decision is further supported by the reports of medical experts presented at defendant's previous rule 11 examination. This is a case where "[t]he appellant's competency to stand trial had been extensively reviewed and determined prior to trial." *State v. Bishop*, 137 Ariz. 5, 8, 667 P.2d 1331, 1334 (App.1983). The trial court had before it the record previously made on each occasion when it reconsidered defendant's competency. We hold that the trial court did not abuse its discretion in refusing to order an additional rule 11 examination to determine defendant's competency to stand trial.

■ Finally, defendant contends that the court failed to assure his competency at sentencing. The trial court must

order a presentence diagnostic evaluation and mental health examination to determine defendant's competency to stand trial if reasonable grounds for an examination exist. *State v. Clabourne*, 142 Ariz. 335, 690 P.2d 54 (1984). Before sentencing, defendant struggled with sheriff's deputies in the hallway outside the courtroom. Apparently, he did not wish to attend the proceeding. In chambers, defense counsel moved for a presentence evaluation. The exchange that followed is documented in a minute entry. The trial judge found:

> [T]he defendant is intentionally and knowingly hindering and obstructing the administration of justice; therefore counsel's request to continue sentencing is denied and the sheriff is directed to gag the defendant and take him into the courtroom for sentencing.

The record contains an affidavit by Ms. Kettlewell stating that no hearing was held before the court's finding of intentional disruption. Defendant argues that his conduct required a competency hearing and emphasizes the trial court's previous statement that it did not know whether defendant was competent or not. We believe defendant takes this statement out of context, because the trial court clearly determined that no reasonable grounds existed to order a competency hearing. No adversarial hearing need be held for a preliminary determination of reasonable grounds. *State v. Cook*, 115 Ariz. 188, 564 P.2d 877 (1977). We find no error.

Defendant also argues that the trial court erred in refusing to appoint psychological and neurological experts to conduct additional tests as part of the rule 32 hearing. Because we hold that the trial court took adequate steps to assure defendant's competency, we need not address this issue.

## 2. *Denial of Motions for Continuances*

 Defendant contends that the trial court committed reversible error by denying his repeated requests for continuances, both before and during trial. The granting of a continuance is within the discretion of the trial court, and its decision will only be disturbed upon a showing of a clear abuse of such discretion and prejudice to defendant. *State v. Williams*, 144 Ariz. 433, 441, 698 P.2d 678, 686 (1985); *State v. Sullivan*, 130 Ariz. 213, 215, 635 P.2d 501, 503 (1981). To determine whether the denial of a continuance violated a defendant's constitutional rights, we must examine the circumstances of the case. *State v. Hein*, 138 Ariz. 360, 369, 674 P.2d 1358, 1367 (1983). Defendant argues that he was prejudiced by the trial court's decision because the denial of a continuance led to his being tried while incompetent and denied effective assistance of counsel. However, because we also reject defendant's arguments in these areas, he has failed to show prejudice resulting from the denial of a continuance. We hold that the trial court acted within its discretion in denying defendant's requests for continuances.

## 3. *Voluntariness of Confession*

 Defendant contends that his confession was obtained in violation of his constitutional rights and is therefore inadmissible. Confessions are presumed to be involuntary, and the state has the burden of proof by a preponderance of the evidence to show that a confession was voluntary and not the product of physical or psychological coercion. In making this determination, the totality of the circumstances surrounding the confession must be considered. *State v. LaGrand*, 153 Ariz. 21, 26, 734 P.2d 563, 568, *cert. denied*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). A confession is rendered involuntary by any of the following factors: (1) impermissible police conduct, (2) coercive pressures that are not dispelled, or (3) a confession derived directly from a prior involuntary statement. *State v. Rivera*, 152 Ariz. 507, 513, 733 P.2d 1090, 1096 (1987). We will not disturb the decision of the trial court absent clear and manifest error. *Rivera*, 152 Ariz. at 513, 733 P.2d at 1096.

First, defendant claims that the allegedly coercive atmosphere at the Yuma Border Patrol Station rendered his confession involuntary. At the time, defendant was wearing only a blanket and jockey shorts,

and claims that he had not eaten, slept, or drunk from the time of his arrest at 12:15 a.m. until his interview with Det. Petropoulos at about 9:30 a.m.

Most of these contentions were controverted by evidence presented at trial and the suppression hearing. Defendant was placed alone in a room containing a bench on which he could have slept. At the hearing on the motion to suppress, Det. Petropoulos testified that defendant was given a drink and cigarettes, although he was unsure whether defendant had eaten. Border Patrol agents testified that defendant was offered food several times, and some evidence indicated that he was given a sandwich during the night.

■ We have previously rejected a defendant's contention that the atmosphere during his interrogation was coercive solely because he was clad only in jockey shorts and a blanket. *See State v. Tison,* 129 Ariz. 526, 537, 633 P.2d 335, 346 (1981). Police officers confiscated defendant's clothing for the valid purpose of preserving evidence. The fact that he was interviewed while clad in a blanket did not render his confession involuntary.

Defendant also alleges impermissible police conduct regarding the interview technique employed by Det. Petropoulos. He argues that certain statements made by the detective constituted impermissible threats or promises. During the interview, Det. Petropoulos urged defendant to tell the truth, in a series of comments, as follows: "We can forgive your lies, but the United States court system will not forgive your lies;" "If you want any forgiveness, you should tell the truth;" and "If you lie to us now it will be on the record for the rest of your life that you lied, and then you'll never be able to say you are sorry."

■ A voluntary confession cannot be induced by a direct or implied promise, however slight. *State v. Ferguson,* 149 Ariz. 200, 207, 717 P.2d 879, 886 (1986). A confession is rendered involuntary as the result of a promise if two requirements are met: first, there must be an express or implied promise, and second, the defendant must rely on the promise in making the

confession. *State v. Hall,* 120 Ariz. 454, 586 P.2d 1266 (1978). Mere advice from the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. *Laub v. State,* 24 Ariz. 175, 207 P. 465 (1922); *People v. Jimenez,* 21 Cal.3d 595, 611, 147 Cal.Rptr. 172, 181, 580 P.2d 672, 681 (1978). Recently, we held that similar statements by police were permissible. *See State v. Walton,* 159 Ariz. 571, 579, 769 P.2d 1017, 1025 ("It's nothing that can't be worked out ... to lie isn't going to help ... give yourself a chance"), *aff'd on other grounds, Walton v. Arizona,* — U.S. —, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). The statements made during defendant's interview were, similarly, mere exhortations to tell the truth. We hold that Det. Petropoulos made no express or implied promise to defendant; therefore, we need not address the question of reliance. We also reject defendant's contention that the statements constituted threats.

■ In addition, defendant argues that Det. Petropoulos fabricated incriminating evidence to induce his confession. The detective told him that two witnesses saw defendant run from the truck that was stolen from the victim and her husband. At trial, Det. Petropoulos testified that this statement was untrue. Standing alone, such a lie during interrogation does not render a confession involuntary. *State v. Cobb,* 115 Ariz. 484, 490, 566 P.2d 285, 291 (1977). As previously noted, our inquiry is whether the totality of the circumstances indicates that a defendant's will was overborne. The circumstances indicate that the detective's lie did not result in an involuntary confession. Even after being confronted with this false incriminating evidence, defendant steadfastly denied stealing the truck, which he continues to deny until this day. This indicates that defendant's will was not overborne by the accusation. We find no error.

Finally, defendant claims that his confession was inherently involuntary due to factors relating to his cultural background.

He argues that, due to inequities in the El Salvadoran justice system, any person would confess to any crime when confronted by police. We have previously rejected this argument. *See Rivera,* 152 Ariz. at 513, 733 P.2d at 1096.

Our decision is further supported by the holding of the United States Supreme Court that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986). In *Connelly,* the Court rejected a defendant's contention that his confession was involuntary because it was prompted by the "voice of God," although police took no coercive action. The Court noted:

> [There is an] essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other. The flaw in respondent's constitutional argument is that it would expand our previous line of "voluntariness" cases into a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there can be no claim that governmental conduct coerced his decision.

*Connelly,* 479 U.S. at 165–66, 107 S.Ct. at 521, 93 L.Ed.2d at 483. This court recently addressed the meaning of "coercive police conduct," holding that police actions must be viewed in light of factors known by police that would affect a defendant's cognition, such as low intelligence or poor language skills. *State v. Carrillo,* 156 Ariz. 125, 750 P.2d 883 (1988); *see State v. Jimenez,* 165 Ariz. 444, 799 P.2d 785 (1990). Here, as in *Connelly* and *Carrillo,* defendant has failed to show that coercive police conduct, rather than internal compulsion, induced his confession. We hold that the trial court did not commit clear and manifest error in finding defendant's confession voluntary.

#### 4. *Knowing and Intelligent Waiver Under Miranda*

Defendant argues that his confession is inadmissible because it was obtained in violation of his constitutional rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). His contention is threefold. First, he claims that due to his limited intelligence and the allegedly perfunctory reading of *Miranda* warnings, he lacked understanding of his constitutional rights. Second, defendant argues that he did not make a knowing and intelligent waiver of those rights. Finally, he contends that he actually invoked his *Miranda* rights, rendering his subsequent confession inadmissible.

Defendant argues that he lacked understanding of his constitutional rights when he confessed. The record reflects that *Miranda* rights were read to him in Spanish at least twice before he confessed. We have examined the testimony of law enforcement officers and listened to the tape recording of defendant's interview, and find that the reading of *Miranda* rights to defendant was sufficient.

Defendant next argues that his limited intelligence and cultural background precluded a knowing and intelligent waiver of his *Miranda* rights. This court has previously rejected similar claims. *See Rivera,* 152 Ariz. at 513, 733 P.2d at 1096; *State v. Montes,* 136 Ariz. 491, 494, 667 P.2d 191, 194 (1983). In *Rivera,* defendant was a Mexican, had a third-grade education, spoke no English, and had no previous contact with the United States justice system. Under circumstances markedly similar to this case, we held Rivera's confession admissible where he was read his rights and interviewed in Spanish, claimed he understood his rights, and nevertheless answered questions posed by police. We decline to disturb the trial court's ruling.

Defendant also raises the question whether he invoked his *Miranda* rights *before* confessing to the murder. After Det. Petropoulos, through an interpreter, read defendant his rights, he asked defendant whether he wished to answer questions. Defendant replied, "I don't know if I will answer them ... ask me something."

He claims that this statement amounted to an invocation of rights.

If a person subject to custodial interrogation invokes his right to remain silent, the interrogation must cease. *State v. Finehout*, 136 Ariz. 226, 229, 665 P.2d 570, 573 (1983). "Even if the defendant's assertion is susceptible to more than one interpretation, the limit of permissible continuing interrogation immediately after the assertion would be for the sole purpose of ascertaining whether the defendant intended to invoke his right to silence." *Finehout*, 136 Ariz. at 229, 665 P.2d at 573.

In this case, however, we find that defendant's statement did not amount to an ambiguous assertion of rights; rather, it was an unambiguous waiver of those rights. *See Bruni v. Lewis*, 847 F.2d 561, 563–64 (9th Cir.), *cert. denied*, 488 U.S. 960, 109 S.Ct. 403, 102 L.Ed.2d 391 (1988), and *cert. denied*, 489 U.S. 1055, 109 S.Ct. 1319, 103 L.Ed.2d 587 (1989) ("Well, ask your questions and I will answer those I see fit" deemed unambiguous waiver of rights). In *Bruni*, the court noted that defendant made a selective waiver to the extent that he later chose to answer questions. Similarly, we find defendant's waiver unambiguous, and affirm the trial court's decision.

### 5. *Evidentiary Rulings*

A. Evidence on El Salvadoran justice system

Defendant contends that the trial court erred in refusing to admit evidence concerning the political situation and justice system in El Salvador. The evidence was offered at both the suppression hearing and at trial, but the court rejected it as irrelevant. The evidence consisted of expert testimony relating to the general political situation in El Salvador, but contained no information about defendant or his personal experience with the political or justice system in that country. Defendant argues that the evidence was relevant to the voluntariness of his confession. He reasons that, because of the volatile political situation and widespread police brutality in his country, any person would likely confess to any crime he was accused of committing.

■ Rule 401, Arizona Rules of Evidence, provides that relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Even relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403. The trial court has considerable discretion in determining the relevance and admissibility of evidence, and we will not disturb its ruling absent a clear abuse of that discretion. *State v. Hensley*, 142 Ariz. 598, 603, 691 P.2d 689, 694 (1984).

In this case, the trial court did not abuse its discretion in refusing to admit evidence on the political situation in El Salvador. This result is made clear by our holding that to be found involuntary, a confession must be the result of coercive police conduct, rather than an internal compulsion to confess. Defendant offered no evidence of coercion.

■ Evidence concerning the circumstances surrounding a confession is relevant to the questions of voluntariness and credibility, and excluding such evidence may deprive an accused of the fundamental constitutional right to a fair opportunity to present a defense. *Crane v. Kentucky*, 476 U.S. 683, 687, 106 S.Ct. 2142, 2145, 90 L.Ed.2d 636 (1986). However, defendant was allowed to introduce detailed evidence of the atmosphere and conduct of his interview with Det. Petropoulos. The evidence excluded by the trial court did not involve *defendant's* experiences in El Salvador, but rather, generalized information not shown to be applicable to his case. The trial court did not abuse its discretion in declining to admit this wholly speculative and irrelevant evidence.

B. Footprint analysis

■ At trial, the state introduced a photograph of the bloody footprint found near

the victim's body and the tennis shoe worn by defendant at the time of his arrest. Detective Leo Duffner and Department of Public Safety criminologist Deborah Friedman were permitted to compare the print to the tread pattern of defendant's tennis shoe. Det. Duffner testified that the shoe and print were of similar design, while Ms. Friedman stated that she detected no dissimilarities. Neither stated that the shoe and the print were "a match." Det. Duffner testified that he had no formal education in shoe comparisons, and no foundational questions concerning shoe comparison were asked of Ms. Friedman. Defendant claims that the trial court improperly admitted the testimony of expert witnesses without proper foundation, over his objection. The trial court admitted the testimony as lay opinion.

Rule 701, Arizona Rules of Evidence, provides:

> If a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Neither witness testified that the print matched the tread pattern on defendant's shoe. Rather, they merely related their personal observations that the patterns were similar. Even assuming, without deciding, that the admission of this testimony was error, the error was harmless. The jury was permitted to compare a photograph of the bloody footprint to the shoe worn by defendant at the time of his arrest. Because the jury was permitted to reach its own conclusion as to the similarity or dissimilarity between the photograph and defendant's shoe, any error in admitting the testimony of Det. Duffner and Ms. Friedman was necessarily harmless. Our court of appeals noted that even under the more restrictive rules of evidence in effect before 1977, lay opinion was rejected as merely superfluous, rather than prejudicial, when facts before the jury allow it to reach an independent conclusion. *State v. Killian*, 118 Ariz. 408, 413, 577 P.2d 259, 264

(App.1978). *See State v. Bryant*, 705 S.W.2d 559 (Mo.App.1986) (erroneous admission of opinion evidence concerning age of person leaving palm print was not prejudicial, because jury could observe and draw its own conclusion); *State v. Snyder*, 66 N.C.App. 191, 310 S.E.2d 799 (1984) (any error in allowing witness to speculate as to what photographs showed was harmless). *See also* M. Udall & J. Livermore, *Arizona Practice: Law of Evidence* § 21 at 25 n. 4 (2d ed. 1982).

### C. Clothing, blood, and urine test results

Defendant argues that his clothing and the results of urine and blood tests were improperly admitted without sufficient foundation. As to the clothing, he maintains that the chain of custody was not established. The clothing worn by defendant at the time of his arrest was removed by Border Patrol Agent Mark Haynes. He did not individually tag the clothing, but placed it in a paper bag marked "Haynes." At trial, Agent Haynes testified that he personally took the clothes from defendant, placed them in the paper bag, and later gave the bag to Det. Petropoulos. Deputy County Attorney Richard Nichols showed Agent Haynes the clothing and the following exchange took place:

Q MR. NICHOLS: You took some clothing as well?

A AGENT HAYNES: Yes, sir.

Q MR. NICHOLS: And this would be the clothing that you yourself took off the suspect?

A AGENT HAYNES: Yes.

Q MR. NICHOLS: I want to show you State's Exhibit No. 102. Did you tag the clothing as well?

A AGENT HAYNES: Tagged the bag the clothing was placed in.

Q MR. NICHOLS: Does this appear to be the bag that it was placed in?

A AGENT HAYNES: It could be. It is a plain brown grocery bag. That's what I put it in and that is what this is.

Q MR. NICHOLS: Do you see your original tag on there anywhere?

A AGENT HAYNES: No, I don't.

Q MR. NICHOLS: Can you look inside the bag and see if you recognize what is in there?

A AGENT HAYNES: A pair of tennis shoes and some socks.

Q MR. NICHOLS: Do they appear to be the ones that you took from the suspect?

A AGENT HAYNES: Yes, sir, they appear to be.

Q MR. NICHOLS: I want you to look now at State's Exhibit 100. Go ahead and rip that open if you can.

A AGENT HAYNES: Tough bag. Yes.

Q MR. NICHOLS: Do you recognize what is in there?

A AGENT HAYNES: Yes; pair of Levis and a handkerchief.

Q MR. NICHOLS: Do these appear to be the items that you took from the suspect?

A AGENT HAYNES: They appear to be covered with stains.

Q MR. NICHOLS: Did you tag the individual items in that bag or would it be just the bag again?

A AGENT HAYNES: I put them all in one bag and tagged the entire bag.

Q MR. NICHOLS: I want you to look inside State's Exhibit 97. Do you recognize what is in there?

A AGENT HAYNES: Yes. There is more or less a sweat shirt type of shirt jacket with a jacket-type shirt with a zipper, and there is one of our I 274 VR forms.

. . . .

Q MR. NICHOLS: At any rate, that one bag of clothes you turned over to Petropoulos?

A AGENT HAYNES: Yes, sir, directly.

Defendant contends that Haynes did not identify the clothing admitted into evidence, and therefore, the chain of custody was not established. Over defendant's objection, the trial court permitted the foundation to be established through Det. Petropoulos' subsequent testimony that, when he arrived at the Yuma Border Patrol Station, Agent Haynes handed him a paper bag, saying "these are the clothes we took

from the suspect [defendant]." Later, Det. Petropoulos identified the clothing as that given to him by Agent Haynes. Additionally, the victim's husband testified that the clothes admitted into evidence belonged to defendant.

A trial court's ruling on admissibility of evidence will not be disturbed on appeal absent a clear abuse of discretion. *State v. Emery,* 141 Ariz. 549, 688 P.2d 175 (1984). A foundation for introduction of evidence may be laid either through identification testimony or by establishing a chain of custody. *State v. Macumber,* 119 Ariz. 516, 521–22, 582 P.2d 162, 167–68 (1978). Rule 901(a), Arizona Rules of Evidence, provides:

> The requirement of . . . identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

It is not incumbent upon a proponent of physical evidence to show that there is no possibility that the evidence was tampered with. *Emery,* 141 Ariz. at 551 n. 1, 688 P.2d at 177 n. 1. Here, Agent Haynes identified the shoes and socks as those he took from defendant, and Det. Petropoulos testified that Agent Haynes previously identified all the clothing as that taken from defendant. Additionally, the victim's husband identified the clothes as belonging to defendant. We agree with the trial court that the state established sufficient foundation for admission of this evidence. *See State v. Cumbo,* 96 Ariz. 385, 396 P.2d 11 (1964) (evidence that witness had earlier identified gun as one with which defendant hit him warranted admission, although witness failed to identify gun at trial). Even if identification is not positive, this fact goes to the weight of the evidence, not its admissibility. *State v. Blazak,* 114 Ariz. 199, 203, 560 P.2d 54, 58 (1977). The trial court did not abuse its discretion.

As to the admission of the blood and urine test results, defendant's failure to object at trial renders admission of this evidence reviewable for fundamental error only. The urine test results were unfavorable to defendant because they failed to

show the presence of alcohol or drugs, thus weakening the defense of intoxication. The blood test results were largely inconclusive because they showed defendant and the victim had similar blood types. However, they showed that blood under the victim's fingernails was her own, and not that of defendant.

"Error is fundamental when it reaches 'the foundation of the case or takes from the defendant a right essential to his defense' or 'is an error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial.'" *State v. King*, 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988) (citations omitted). A medical specialist obtained defendant's blood and urine samples pursuant to court order. No witness testified that he personally took samples from defendant, but in view of the overwhelming evidence of guilt and the fact that the evidence did not incriminate defendant, any error was harmless. Harmless error is not reversible fundamental error. *King*, 158 Ariz. at 424 n. 4, 763 P.2d at 244 n. 4. As to the victim's samples, the state showed a completed chain of custody. The trial court acted within its discretion in admitting this evidence.

### D. Fingernail scrapings

■ Defendant argues that the state's action in taking his fingernail scrapings without a search warrant or judicial order violated his constitutional right to be free of unlawful searches and seizures under the United States and Arizona Constitutions. The scrapings were taken at 1:00 p.m. on March 29, 1985, just after defendant had arrived in Tucson and was awaiting his initial appearance in court. Shortly after a medical specialist took the samples, a court order was obtained. The trial court found the seizure justified by exigent circumstances, based on the danger that defendant might wash his hands or otherwise destroy the evidence.

"[E]xigent circumstances can justify a search based on probable cause when imminent destruction of evidence is likely and the intrusion is minimal." *State v. Cocio*, 147 Ariz. 277, 286, 709 P.2d 1336, 1345

(1985). The United States Supreme Court has upheld the taking of fingernail scrapings absent a warrant where these circumstances exist. *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). Defendant attempts to distinguish *Cupp* because there, the accused had come voluntarily to the police station and was about to leave, rendering destruction of the evidence imminent. We fail to see how destruction was less likely here, where defendant was about to make his initial court appearance, and might easily wash his hands or otherwise destroy the evidence. In light of this established precedent, defendant's argument is misplaced. The trial court did not abuse its discretion in admitting testimony relating to the fingernail scrapings.

### E. Photographs of victim and crime scene

At trial, the court admitted 18 photographs of the victim and the crime scene over defendant's objection, although the defense offered to stipulate to the cause and manner of death. Defendant contends that his due process rights were violated by the admission of gruesome photographs.

■ The trial court has discretion to decide whether to admit photographs, and we will not disturb its ruling absent a clear abuse of that discretion. *State v. Bailey*, 160 Ariz. 277, 772 P.2d 1130 (1989). The trial court must conduct a two-part inquiry in determining the admissibility of photographs. First, the photographs must be relevant. Photographic evidence is relevant if it aids the jury in understanding any issue in dispute. Second, the court must inquire whether the photographs would tend to incite passion or inflame the jury. In the event that they are inflammatory, the court balances their probative value against their potential to cause unfair prejudice. *Bailey; see* rule 403, Arizona Rules of Evidence.

■ Of the 18 photographs admitted into evidence, only two showed the victim's bloody corpse at the murder scene. The rest were taken at the autopsy, and show close ups of the victim's many wounds. The state offered the photographs to assist

its witnesses, a pathologist and a detective, in discussing the victim's many wounds and the crime scene. The evidence was clearly relevant. *See Clabourne*, 142 Ariz. at 343, 690 P.2d at 62. We have reviewed the photographs and find only those taken at the scene even arguably gruesome. However, we find that any possible prejudice to defendant is outweighed by their probative value. The state offered these photographs to show the crime scene—the position of the victim, the amount and location of the blood, and the location of the bloody shoe print. In prosecuting a crime of this nature, the state must be allowed some latitude to show what actually occurred. Additionally, the fact that defendant was willing to stipulate to the cause and manner of death does not render the photographs inadmissible. *Clabourne.* We find no abuse of discretion.

### 6. *Prosecutorial Misconduct*

■ Defendant alleges that the Deputy County Attorney introduced irrelevant and prejudicial material, attacked defense counsel, and appealed to the passions and prejudices of the jury during trial in violation of his constitutional right to due process. First, defendant challenges remarks made in the prosecutor's opening statement referring to the discovery of centerfolds of nude women found taped to the walls of defendant's bedroom. The prosecutor said, "When the police searched his little room that he was staying in, they found a lot of centerfolds from Playboy-type magazines, and there were about maybe three or four of them that he had taped up on the wall, fairly risque stuff. I'll have photographs of it for you to see." Mr. Nichols then told the jury that defendant admitted looking at these pictures just before murdering the victim, but claimed to have no intent to sexually assault her. During closing argument, he told the jury that although defendant denied that rape was the motive for this crime, such a motive might be inferred in light of the evidence.

Defense counsel failed to object to these statements, so the issue is waived on appeal absent a finding of fundamental error. *State v. Smith*, 138 Ariz. 79, 83, 673 P.2d 17, 21 (1983); *State v. Denny*, 119 Ariz. 131, 134, 579 P.2d 1101, 1104 (1978). In this case, the record indicates that defendant looked at pictures of nude women shortly before killing the victim. Although defendant denied that his motive was rape, that inference was supported by the evidence. *State v. Branch*, 108 Ariz. 351, 355, 498 P.2d 218, 222 (1972); *State v. Grijalva*, 137 Ariz. 10, 13, 667 P.2d 1336, 1339 (App. 1983). We find no error, fundamental or otherwise.

■ Defendant also alleges that the prosecutor made improper comments about defense counsel during his closing statement. Specifically, Mr. Nichols attacked the defense theory of a frame-up, saying that Ms. Kettlewell "blind sided" witnesses, relied on "innuendo and inference" to support her theory, and made accusations against witnesses who were unable to respond. He characterized the defense as a "smoke screen," stating:

As to the framing of Mr. Amaya–Ruiz by Detective Petropoulos, I want to make a couple of observations on that. That is quite an outrageous argument for her to make. She may not be outraged by this prospect, but I certainly am.

Again, we need only review this allegation for fundamental error, because defendant failed to timely object. *Smith*, 138 Ariz. at 83, 673 P.2d at 21. Defendant argues that these comments were disparaging to his counsel, and therefore improper. However, when taken in context, the remarks appear merely to point out that the prospect of a conspiracy between at least two law enforcement agencies to frame defendant is and should be outrageous to any concerned citizen. Mr. Nichols attacked defendant's argument, rather than his counsel. "Wide latitude is given in closing arguments and counsel may comment on the evidence and argue all reasonable inferences therefrom." *State v. Zaragoza*, 135 Ariz. 63, 68, 659 P.2d 22, 27 (1983). "[S]ome amount of emotion in closing argument is not only permissible, it is to be expected." *Zaragoza.* The prosecutor's comments were not improper, and cer-

tainly did not rise to the level of fundamental error.

Defendant further contends that the prosecutor introduced irrelevant and prejudicial material that appealed to the sympathies of the jurors. He points to a photograph of the victim and her husband, apparently admitted into evidence for identification purposes, and the alleged admission of "girlie pictures" belonging to defendant. We note that the "girlie pictures" were not admitted into evidence; they were merely visible in a photograph of defendant's living quarters that was introduced. Additionally, defense counsel failed to object in either instance. The trial court acted within its discretion in admitting both photographs.

 Lastly, defendant claims that Mr. Nichols appealed to the passions of the jurors by stating, in his closing argument, that "[i]f you let him go, you would let a confessed murderer go." Defendant objected to this comment during closing argument, and the trial court allowed Mr. Nichols to continue, after cautioning him to refrain from speculating about crimes defendant might commit if acquitted. Again, the prosecutor was merely commenting on the evidence, as he may properly do. *Zaragoza.* Defendant's confession was properly admitted into evidence, and the prosecutor did not err by calling that fact to the jury's attention.

### 7. *Jury Instructions*

#### A. *Miranda*

The trial court agreed to submit defendant's Requested Instruction 32 to the jury, but inadvertently omitted it. The requested instruction explained *Miranda* and its requirement that a waiver of rights be knowing and voluntary in light of the totality of the circumstances surrounding the confession. It enumerated circumstances specific to a defendant that the jury may consider in determining whether a waiver was knowing, voluntary, and intelligent. These circumstances included "defendant's age, experience, education, background, and intelligence, and ... whether he has the capacity to understand the warnings

given him, the nature of his constitutional rights and the consequences of waiving those rights."

The court submitted Recommended Arizona Jury Instruction (RAJI) 1.07 on the issue of voluntariness, but did not instruct the jury on *Miranda*. However, before the jury retired for deliberations, defense counsel indicated that no instructions had been omitted. The judge instructed the jury as follows:

> You must not consider any statements made by the defendant to a law enforcement officer unless you determine beyond a reasonable doubt that the defendant made the statements voluntarily. The defendant's statement is not voluntary whenever a law enforcement officer used any sort of violence or threats or any promise of immunity or benefit.

 Voluntariness and *Miranda* are separate legal issues. *State v. Tapia,* 159 Ariz. 284, 286, 767 P.2d 5, 7 (1988). The trial court must give a jury instruction on voluntariness upon defendant's request, and an inadvertent omission of the requested charge can be reversible error. *State v. Porter,* 122 Ariz. 453, 455–56, 595 P.2d 998, 1000–01 (1979). However, the admissibility of confessions under *Miranda* need not be presented to the jury, but is subject to the independent determination of the trial judge. *State v. Morse,* 127 Ariz. 25, 29, 617 P.2d 1141, 1145 (1980). Because the trial court had no duty to give the requested instruction, its inadvertent omission does not amount to reversible error.

#### B. Transferred intent

 Defendant was charged with manslaughter under A.R.S. § 13–1103(A)(5), which proscribes "[k]nowingly or recklessly causing the death of an unborn child at any stage of its development by any physical injury to the mother of such child which would be murder if the death of the mother had occurred." *See* A.R.S. § 13–105(6) (definitions of culpable mental states). The trial court instructed the jury:

> If knowingly causing a particular result is an element of an offense, and the actual result is not within the intention

or contemplation of the person, that element is established if the actual result differs from that intended or contemplated only in the respect that a different person is injured.

If recklessly causing a particular result is an element of an offense, and the actual result is not within the risk of which the person is aware, that element is established if the actual result differs from the probable result only in the respect that a different person is injured.

These instructions are correct statements of the law of transferred intent and were submitted to the trial court by the state. *See* A.R.S. § 13–203(B), (C). The court gave the instructions over defendant's objection.

Although the doctrine of transferred intent generally applies in criminal law, a particular statute may be worded so as to preclude its application. *See* W. LaFave & A. Scott, *Criminal Law* 253 n. 36 (1972). We hold that A.R.S. § 13–1103(A)(5) is such a statute that precludes the doctrine of transferred intent because it explicitly requires two separate mental states, one toward the mother, and the other toward the unborn child. The defendant must (1) knowingly or recklessly cause the death of an unborn child at any stage of its development, *and* (2) death must be caused by a physical injury to the mother of the unborn child that would be murder if the death of the mother had occurred.[1]

■ The transferred intent instruction given by the trial court allowed the jury to convict defendant of manslaughter without finding the mental state *toward the unborn child* required by our statute. Because we cannot be sure whether the verdict was based on the incorrect instruction, we must reverse defendant's manslaughter conviction. As we have previously stated:

At best, taken as a whole, the instructions were confusing and misleading. Long ago we stated, "It is the duty of

the court to give the jury the rules of law to guide their deliberations and determinations, and these rules must not be at such cross purposes as to confuse and mislead the jury. If the instructions are contradictory upon the main point in question, how is the jury to know which to follow, or which is a correct statement of the law?"

*King*, 158 Ariz. at 425–26, 763 P.2d at 245–46, citing *Hurley v. State*, 22 Ariz. 211, 222, 196 P. 159, 163 (1921). Where erroneous instructions allow the jury to reach a guilty verdict without finding every element of the offense, we have reversed defendants' convictions. *State v. Williams*, 154 Ariz. 366, 368–69, 742 P.2d 1352, 1354–55 (1987).

We recognize that courts, relying on the harmless error doctrine, have affirmed convictions despite erroneous jury instructions if the record shows that the defendant is guilty beyond a reasonable doubt. *See Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987); *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). As in *Williams*, however, we find this reasoning inapplicable. In this case, the erroneous jury instruction is not harmless error because it lessened the state's burden to prove every element of the offense. *See State v. Rendon*, 161 Ariz. 102, 104, 776 P.2d 353, 355 (1989). Therefore, we reverse defendant's conviction of manslaughter.

### C. Submission of indictment to jury

■ The trial court submitted a copy of the indictment to the jury for use during deliberations without deleting statutory references, felony designations, the prosecutor's signature, the words "true bill," or the signature of the grand jury foreman. Defendant argues that this violated rule 21.3(b), Arizona Rules of Criminal Procedure, which provides: "The court shall not

---

1. We need not address the second criminal intent required by A.R.S. § 13–1103(A)(5). We note that the statutory language appears susceptible to differing interpretations. The phrase *"if the death of the mother had occurred"* might support an argument that the statute is inapplicable if the woman is murdered, and is only applicable if she survives. Defendant did not raise this argument and, because we reverse his manslaughter conviction on other grounds, we decline to decide the question.

inform the jury which instructions, if any, are included at the request of a particular party." We do not believe that the rule was violated by submission of the indictment. The mere fact that the prosecuting attorney signed the indictment does not indicate that he requested it be given to the jury.

■■■ Alternatively, defendant contends that the indictment contained prejudicial surplusage. Before reading the indictment, the trial court instructed the jury that the indictment is not evidence and does not create a presumption or permissible inference of guilt. The cautionary instructions adequately informed the jury that the words "true bill" and the signature of the grand jury foreman were not evidence against defendant. We find no error. *See United States v. Ramirez,* 710 F.2d 535, 545 (9th Cir.1983).

### D. Failure to give reckless manslaughter instruction

Defendant requested that the jury be instructed on the crime of reckless manslaughter, and objected to the trial court's refusal to do so. He claims that the instruction is supported by his statement to Det. Petropoulos that he was intoxicated at the time of the murder.

■■■ In a capital case, the trial court must instruct the jury on each degree of homicide supported by the evidence. *State v. Thomas,* 112 Ariz. 261, 540 P.2d 1242 (1975). In this case, the trial court instructed the jury on both first and second degree murder; however, the facts do not support a reckless manslaughter instruction. The brutality of the murder precludes a reckless manslaughter instruction in this case, where the defendant showed such extreme indifference to human life. Even if intoxication negated defendant's intent, he nevertheless would be guilty of second degree murder, not manslaughter. *See State v. Reffitt,* 145 Ariz. 452, 463, 702 P.2d 681, 692 (1985). Additionally, when a defendant is convicted of first degree murder rather than second degree murder, any error as to instructions on lesser included offenses is necessarily harmless, because

the jury has necessarily rejected all lesser-included crimes. *State v. Ortiz,* 158 Ariz. 528, 764 P.2d 13 (1988).

### E. Failure to give intoxication instruction

Defendant argues that the trial court's failure to instruct the jury on voluntary intoxication was reversible error. Because defendant did not request such an instruction, we review the trial court's action only for fundamental error. *Reffitt,* 145 Ariz. at 463, 702 P.2d at 692.

■■■ An intoxication instruction is unwarranted where it is not reasonably supported by the evidence. *State v. Borbon,* 146 Ariz. 392, 398, 706 P.2d 718, 724 (1985). Here, test results failed to show the presence of alcohol or drugs in defendant's blood and urine. Additionally, the defense theory was misidentification, not voluntary intoxication, and the failure to so instruct was not fundamental error. *State v. Marlow,* 163 Ariz. 65, 786 P.2d 395 (1989).

### 8. *Aggravation/Mitigation Hearing*

The trial court granted defendant's request to leave his aggravation/mitigation hearing. He was taken to the hearing in shackles, and for this reason, did not wish to remain. On appeal, he claims that this action violated his constitutional rights.

First, defendant argues that, in a capital case, the right to be present at all stages of the proceeding may not be waived. The sixth amendment to the United States Constitution, made applicable to the states through the fourteenth amendment, protects the right of an accused to be present at trial. However, it is unclear whether the right to be present at post-verdict proceedings is constitutional, rather than procedural. *See Proffitt v. Wainwright,* 685 F.2d 1227, 1256 (11th Cir.1982). The United States Supreme Court has held that *sentencing* is a "critical stage of the proceedings" in a capital case, and must conform to the requirements of due process. *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Thus, the

right to be present at sentencing in a capital case is of constitutional magnitude.

██ Arizona recognizes a defendant's right to be present at a presentence hearing. "The defendant is entitled to be present at a presentence hearing and shall be present at sentencing." Rule 26.9, Arizona Rules of Criminal Procedure. We have held that "defendant must be present at his sentencing except in extraordinary circumstances." *State v. Fettis*, 136 Ariz. 58, 664 P.2d 208 (1983). Our rule clearly distinguishes between the right to attend a presentence hearing and the right to be present at sentencing. Regardless of the nature of the right to attend a presentence hearing, whether it be constitutional or procedural, we decline to hold that a defendant may not waive the right in a capital case, provided the waiver is knowing, voluntary and intelligent.

We recognize that the United States Supreme Court held, more than 100 years ago, that one accused of a capital crime may not constitutionally waive his right to be present at *trial*. *Hopt v. Utah*, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884); *see also Diaz v. United States*, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912) (non-capital case). However, these cases do not address waiver of the right to be present at presentence hearings; in any event, more recent Supreme Court decisions have suggested that these holdings are ripe for reconsideration. *See Drope*, 420 U.S. at 182, 95 S.Ct. at 909; *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

██ The Eleventh Circuit has held that a defendant may not waive his right to be present at presentence hearings. *Proffitt*, 685 F.2d at 1258. We find the reasoning of *Proffitt* unpersuasive. Several courts have held that although a defendant may validly waive his right to be present at a presentencing hearing in a non-capital case, that waiver must be knowing, voluntary, and intelligent. *Proffitt*, 685 F.2d at 1258 n. 45 (listing cases). We believe that the right to waive presence extends to presentence hearings in capital cases. Here, defendant was informed of the hearing, attended with counsel, and asked to be removed just as

the hearing was to begin. Before allowing his removal, the trial court explained that defendant had a right to be present and outlined the general purpose of the hearing. Defendant nevertheless insisted that he be removed. We find his waiver knowing, voluntary, and intelligent, and hold that the trial court did not err by allowing defendant to leave the aggravation/mitigation hearing. Defendant's argument that he was incompetent to waive this right is misplaced because his conduct at the time did not mandate further inquiry into his competency.

██ Additionally, defendant argues that the trial court erred by ordering that he be shackled at the aggravation/mitigation hearing and shackled and gagged at sentencing. He claims that this action violated his rights to confrontation and allocution. "An appellate court will not find error on the ground that the defendant was shackled unless it is shown that the jury saw the shackles." *State v. McMurtrey*, 136 Ariz. 93, 98, 664 P.2d 637, 642 (1983). Regarding allocution, although defendant was gagged, the trial court gave him an opportunity to speak, and he refused. The record contains ample evidence to support the court's decision to gag defendant. The trial court stated on the record that she directed the sheriff to gag defendant because he "is intentionally and knowingly hindering and obstructing the administration of justice." Defendant was given every opportunity to exercise his right of allocution. We find no error.

### 9. *Death Penalty*
#### A. Constitutionality

Defendant challenges the constitutionality of the Arizona death penalty statute, A.R.S. § 13–703, on several grounds. He argues (1) the statute and its judicial construction provide inadequate standards for weighing aggravating and mitigating factors, allowing imposition of the death penalty in an arbitrary and capricious manner; (2) the statutory aggravating factor of "especially heinous, cruel or depraved" is unconstitutionally vague; (3) the statute violates due process by requiring imposi-

tion of the death penalty upon a finding of one aggravating factor and no mitigating factors; (4) the statute improperly places the burden of proving mitigating circumstances on the defendant; (5) the statute does not require that aggravating factors outweigh mitigating factors beyond a reasonable doubt; (6) the statute is unconstitutional because it fails to provide for jury determination of aggravating and mitigating factors; and (7) the statute violates due process by giving the prosecutor unfettered discretion in deciding to seek the death penalty.

Recently, the United States Supreme Court provided a definitive answer to many of the constitutional challenges defendant raises. *Walton v. Arizona*, — U.S. —, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). A majority of the Court agreed that (1) the sixth amendment to the United States Constitution does not require that a jury determine whether the death penalty should be imposed or make findings of aggravating and mitigating circumstances; and (2) our construction of the statutory aggravating circumstance "especially heinous, cruel or depraved" meets the requirements of the eighth and fourteenth amendments. Sections 3 and 4 of the Court's opinion were not joined by Justice Scalia, who wrote separately concerning these issues. In those sections, the plurality upheld our requirement that defendants establish mitigating circumstances by a preponderance of the evidence and rejected Walton's argument that our statute creates an unconstitutional presumption that death is the proper sentence in cases where one or more aggravating circumstances are present and the court finds no mitigating circumstances sufficient to require leniency. *See also Lewis v. Jeffers*, — U.S. —, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

We interpret *Walton* as clearly upholding our death penalty statute and this court's judicial construction of its provisions against all constitutional challenges raised in that case.

Justice Scalia, in his concurrence, criticizes the Court's death penalty jurisprudence in the area of mitigating circum-

stances for imposing requirements not mandated by the constitution. Essentially, he argues that the Arizona death penalty scheme is *more* constitutionally acceptable than the majority would concede. Therefore, we interpret *Walton* as a clear statement by a majority of the Court upholding our statute against all challenges considered, including those sections in which Justice Scalia concurred.

This court, in a long line of cases, has consistently rejected the constitutional arguments raised by defendant. *See State v. McCall*, 160 Ariz. 119, 770 P.2d 1165 (1989), *cert. denied*, — U.S. —, 110 S.Ct. 3289, 111 L.Ed.2d 798 (1990) (vagueness); *Walton*, 159 Ariz. 571, 769 P.2d 1017 (imposition not arbitrary and capricious, vagueness, judicial discretion, burden of proof in weighing aggravation and mitigation, burden of proof of mitigation, jury participation); *State v. Fulminante*, 161 Ariz. 237, 260, 778 P.2d 602, 625 (1988) (vagueness, judicial discretion, standard for balancing aggravating and mitigating factors, burden of proof of mitigation, jury participation), *cert. granted on other grounds*, — U.S. —, 110 S.Ct. 1522, 108 L.Ed.2d 762, and *cert. denied, Fulminante v. Arizona*, — U.S. —, 110 S.Ct. 1528, 108 L.Ed.2d 768 (1990); *State v. Beaty*, 158 Ariz. 232, 762 P.2d 519 (1988) (burden of proof in weighing aggravation and mitigation, judicial discretion, standards for balancing aggravating and mitigating factors, jury participation), *cert. denied, Beaty v. Arizona*, 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989); *State v. Harding*, 137 Ariz. 278, 670 P.2d 383 (1983) (unfettered prosecutorial discretion).

We are aware of the decision of the United States Court of Appeals for the Ninth Circuit invalidating our death penalty on some of the grounds raised here. *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir.1988), *cert. denied sub nom. Lewis v. Adamson*, — U.S. —, 110 S.Ct. 3287, 111 L.Ed.2d 795 (1990). Denial of a petition for certiorari by the United States Supreme Court "imports no expression on the merits of the case." *United States v. Carver*, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361 (1923); *see* R. Stern, E. Gress-

man & S. Shapiro, *Supreme Court Practice* § 5.7, at 269 (6th ed. 1986).

However, *Walton* specifically holds contrary to the Ninth Circuit opinion on each of the constitutional challenges to our statute considered in *Adamson*. The following arguments, considered in *Adamson*, were rejected by the Court in *Walton:*

(1) Does the sixth amendment require jury determination of aggravating circumstances?

(2) Is the aggravating factor that the offense was committed in an "especially heinous, cruel or depraved" manner, along with judicial narrowing by the Arizona Supreme Court, unconstitutionally vague?

(3) Does the Arizona statutory scheme preclude consideration of all mitigating evidence by requiring that defendants prove the existence of mitigating factors by a preponderance of the evidence?

(4) Does the Arizona statute impose an unconstitutional presumption of death where the court finds the existence of one aggravating circumstance and no mitigating circumstances sufficiently substantial to call for leniency?

We therefore conclude that *Walton* has rejected *Adamson* by rejecting arguments identical to those forming the basis for the Ninth Circuit opinion. This court will follow the clear directive of the United States Supreme Court in *Walton.*

B. Independent review of sentence

■ This court has a duty to independently review the existence of aggravating and mitigating circumstances and to ensure that the death penalty has not been improperly imposed. *Fulminante*, 161 Ariz. at 254, 778 P.2d at 619. Defendant argues that the trial court erred in finding the murder was committed in an especially cruel, heinous, or depraved manner. *See* A.R.S. § 13–703(F)(6). Additionally, he claims that the court erred by failing to find the existence of mitigating factors sufficiently substantial to outweigh the aggravating factors.

1. *Aggravating Factors*

By special verdict, the trial court found the murder to be especially cruel, heinous, and depraved based on the following factors:

a. 26 stab wounds and 8 lacerations caused great suffering and anguish to the victim, who did not die immediately;

b. the court finds that the defendant knew of the victim's pregnancy and had been treated kindly by her;

c. the court finds that the defendant inflicted an execution style murder by shooting the victim in the ear while she was still alive; and

d. the defendant showed no remorse.

The terms "cruel, heinous, or depraved" are considered disjunctively; a finding of any one of the three constitutes an aggravating circumstance under our statute. *Fulminante.*

a. Cruelty

■ We have defined cruelty as the pain and suffering of the victim suffered prior to death, including mental distress. *Fulminante*, 161 Ariz. at 254, 778 P.2d at 619; *State v. Castaneda*, 150 Ariz. 382, 393, 724 P.2d 1, 12 (1986). A finding of cruelty requires that the victim be conscious at the time of the offense in order to suffer pain and distress. When evidence of consciousness is inconclusive, a finding of cruelty is unsupported. *Fulminante*, 161 Ariz. at 259, 778 P.2d at 620; *State v. Gillies*, 135 Ariz. 500, 513, 662 P.2d 1007, 1020 (1983).

■ In this case, the victim's sister testified that after the victim answered her assailant's knock, the victim exclaimed "leave me alone, I'll give you the gun," and then her sister heard scuffling noises. Additionally, defensive wounds on the victim's hands indicate that she struggled to save her life. We find this evidence sufficient to establish that the victim suffered conscious pain and mental distress, supporting a finding of cruelty. *See State v. Summerlin*, 138 Ariz. 426, 436, 675 P.2d 686, 696 (1983).

Although conflicting evidence was presented as to whether the stabbing or the gunshot occurred first, we find that the physical evidence refutes defendant's contention that the gunshot came first, immediately disabling the victim. The crime scene exhibited signs of a violent and bloody struggle. Blood was splattered through several rooms, indicating that defendant pursued the victim as she unsuccessfully fought for her life. We note that the authority defendant relies upon is easily distinguishable. *See State v. Ortiz*, 131 Ariz. 195, 639 P.2d 1020 (1981). In *Ortiz*, no evidence existed to indicate a violent struggle. There, the victim may have been killed by a quick stab wound to the chest after being taken by surprise. This court held that the state failed to prove beyond a reasonable doubt that the victim suffered during commission of the murder. *Ortiz*, 131 Ariz. at 210, 639 P.2d at 1035. As this court recently stated, "[o]ur case law does not [require] that the victim be conscious for each and every wound." *State v. Lopez*, 163 Ariz. 108, 115, 786 P.2d 959, 966 (1990). We hold that the trial court's finding of cruelty is supported by the record.

### b. Heinousness and depravity

■ An especially heinous murder has been defined as one that is "hatefully or shockingly evil." *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977). A murder is depraved if "marked by debasement, corruption, perversion or deterioration." *Knapp*. The terms "heinous" and "depraved" focus upon a defendant's state of mind at the time of the offense. *Fulminante*, 161 Ariz. at 255, 778 P.2d at 620. We have enumerated five factors properly considered in determining whether conduct is heinous or depraved:

1. the relishing of the murder by the defendant;
2. the infliction of gratuitous violence on the victim beyond that necessary to kill;
3. mutilation of the victim's body;
4. the senselessness of the crime; and
5. the helplessness of the victim.

*State v. Gretzler*, 135 Ariz. 42, 51–52, 659 P.2d 1, 10–11 (1983).

■ The record supports the finding of heinous and depraved conduct. The large number of stab wounds and contact gunshot wound to the victim's head show gratuitous violence beyond that necessary to kill. *See Clabourne*, 142 Ariz. at 348, 690 P.2d at 67. The victim and her husband befriended defendant and provided him with food, shelter, and clothing. Clearly, this was a senseless crime. *See State v. Clark*, 126 Ariz. 428, 437, 616 P.2d 888, 897 (1980).

Defendant's argument that we must look beyond the facts of the crime to determine whether heinousness and depravity are present is misplaced. Our previous holdings make it clear that we judge heinousness and depravity by a defendant's words and acts. Surely, when faced with the brutal and senseless murder of one who had been kind to defendant, we are justified in finding the crime heinous and depraved. *See generally* Annotation, *Sufficiency of Evidence, For Purposes of Death Penalty, To Establish Statutory Aggravating Circumstance that the Murder was Heinous, Cruel, Depraved, or the Like—Post Gregg Cases*, 63 A.L.R.4th 478 (1988). We hold that the trial court properly found the existence of statutory aggravating circumstances that would support imposition of the death penalty in the absence of mitigating circumstances.

### 2. *Mitigating Circumstances*

Defendant argues that the trial court's failure to find mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances violated his constitutional rights. The trial court considered the following mitigating circumstances offered by defendant: (1) lack of prior felony convictions; (2) limited intelligence and formal education; (3) deprived cultural background; (4) character evidence indicating no previous history of violence; (5) cooperation with law enforcement at time of arrest; (6) age at time of offense; (7) lack of required intent; and (8) remorse at time of arrest.

Some of these arguments are not factually supported. Although defendant eventually confessed, he did not cooperate with law enforcement. Rather, he attempted to flee the jurisdiction, asked to be deported to Mexico immediately after his apprehension, and denied committing the crime when initially questioned. As to defendant's cultural background, the trial court had little information because of defendant's refusal to discuss the matter.

Defendant's other claims in mitigation have been held insufficient to merit leniency in prior cases. *See, e.g., Clabourne,* 142 Ariz. at 348, 690 P.2d at 67 (age—20 years, alleged incompetency, deprived cultural background, remorse); *State v. Harding,* 137 Ariz. 278, 670 P.2d 383 (1983) (low I.Q.); *Ortiz,* 131 Ariz. at 211, 639 P.2d at 1020 (low I.Q., lack of prior criminal record, lack of intent); *Clark,* 126 Ariz. at 437, 616 P.2d at 897 (age—20 years, poor home life, lack of prior criminal record, emotional problems).

In addition, we have independently reviewed the record for evidence of other possible mitigating circumstances and find none sufficient to merit leniency. We have considered defendant's arguments relating to his alleged incompetency and an anonymous letter containing a totally unsubstantiated charge that someone other than defendant committed the murder. The trial court was aware of the contents of the letter, and defense counsel mentioned it at the aggravation/mitigation hearing. Apparently, the trial court refused to make it part of the record on appeal because its contents were not only unsubstantiated, but clearly false. In any event, we note that once a defendant is found guilty beyond a reasonable doubt, unfounded and unsupported claims of innocence do not constitute mitigation for sentencing purposes, and the letter is analogous to a claim of innocence. *State v. Bracy,* 145 Ariz. 520, 538, 703 P.2d 464, 482 (1985); *State v. Carriger,* 143 Ariz. 142, 162, 692 P.2d 991, 1011 (1984).

Finally, defendant contends that the trial court improperly received victim impact statements and other prejudicial information contained in the presentence report. As to the victim impact statements, we have previously rejected this argument. "Absent proof to the contrary, the trial judge in a capital case must be presumed to be able to focus on the relevant sentencing factors and to set aside the irrelevant, the inflammatory, and the emotional factors." *Beaty,* 158 Ariz. at 244, 762 P.2d at 531. *See State v. Hinchey,* 165 Ariz. 432, 799 P.2d 352 (1990). Furthermore, defense counsel failed to object to the information in the presentence report. Absent fundamental error, which we do not find, the argument has been waived. Our independent review discloses that the aggravating circumstance found by the trial court justified imposition of the death penalty and that no mitigating factors outweighed those in aggravation.

## C. Proportionality review

■ This court conducts a proportionality review to determine whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *Fulminante,* 161 Ariz. at 258, 778 P.2d at 623. We find that defendant's sentence is proportional to the sentences imposed in other cases in this jurisdiction. *See Clabourne,* 142 Ariz. at 348, 690 P.2d at 67 (victim strangled and stabbed twice in chest); *State v. Gillies,* 135 Ariz. 500, 513, 662 P.2d 1007, 1020 (1983) (victim pushed off a 40-foot cliff and pelted with rocks).

We have reviewed cases in which this court has reduced the sentence imposed to life imprisonment, and also have compared the penalty to that imposed for similar crimes in other jurisdictions. We find defendant's sentence neither excessive nor disproportionate.

## 10. *Ineffective Assistance of Counsel*

Defendant contends that the trial court erred in denying his petition for post-conviction relief based on ineffective assistance of counsel. He alleges that the following acts and omissions of defense counsel constituted ineffective assistance:

1. failure to adequately investigate his mental condition;

2. failure to interview and prepare witnesses;

3. failure to seek independent testing to rebut expert testimony offered by the state;

4. failure to make proper legal objections and motions, including:

 a. failure to move to suppress physical evidence and confession;

 b. failure to challenge destruction of evidence;

 c. failure to move to continue when confronted with surprise testimony;

 d. failure to move to exclude irrelevant and unsubstantiated information;

 e. filing "bare bones" motions;

 f. failure to produce exculpatory testimony;

 g. inadequate cross-examination of witnesses;

 h. failure to object to hearsay used to establish chain of custody;

 i. failure to object to admission of irrelevant and prejudicial evidence;

 j. failure to exclude victim's relatives from courtroom;

 k. failure to object to identification of gun based on serial number found on gun box, which was hearsay.

5. failure to adequately investigate the source of the anonymous exculpatory letter, made available to defense counsel before sentencing.

 Absent an abuse of discretion, we will not disturb a trial court's denial of post-conviction relief. *State v. Adamson,* 136 Ariz. 250, 665 P.2d 972 (1983). To determine whether a conviction should be reversed due to ineffective assistance of counsel, we apply a two-pronged test: (1) whether counsel's performance was reasonable under all the circumstances; and (2) whether a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Fulminante,* 161 Ariz. at 260, 778 P.2d at 625. The court need not address the reasonableness of counsel's conduct if it fails to find that defendant suffered prejudice as a result of the alleged deficiencies. *Fulminante.*

Initially, we note that defendant's trial attorney, Susan Kettlewell, was quite experienced. She had conducted more than 40 jury trials before representing defendant, although she had not tried a capital case. Additionally, the defense was difficult, due to the strength of the state's case and defendant's refusal to cooperate with Ms. Kettlewell and co-counsel Anthony Ramos. The only viable defense theory was misidentification, a theory belied by the substantial evidence implicating defendant in the murder.

Considering the totality of the evidence before the jury, we do not believe counsel's alleged errors support an ineffective assistance claim. First, we found that the trial court took adequate steps to assure defendant's competency, and similarly reject defendant's contention that counsel failed to properly investigate his mental condition. In view of defendant's failure to cooperate, it is difficult to comprehend what further steps reasonably could be required. Defendant's psychiatric records from prison, which were presented for the first time at the rule 32 hearing, do not establish ineffective assistance of counsel. The records contain reference to defendant's occasional complaints of depression and other mental problems, but consistently note the possibility that defendant was malingering. The records show no more evidence of incompetency than was originally rejected by the trial court.

 Second, defendant claims that he was prejudiced by his counsel's failure to interview and prepare witnesses. In fact, defense counsel interviewed all the major state's witnesses, and testified at the rule 32 hearing that she was allowed complete discovery. Even assuming, without deciding, that the failure to interview 5 witnesses for the prosecution was professional error, we find no prejudice to defendant. Even if the interviews had been conducted, they would have been useful only for impeachment and would not have affected the result of the proceeding in light of the

state's other evidence, including defendant's confession.

Additionally, defendant argues that his counsel's failure to procure expert testimony on the political situation in El Salvador constituted ineffective assistance. Again, he fails to show prejudice, because of our holding today that such testimony was properly ruled inadmissible.

■ Third, defendant challenges his counsel's failure to seek independent testing to rebut testimony offered by the state. Specifically, he points to testimony concerning the bloody footprint, the possibility that the knife found in the truck could have caused the fatal wounds, results of drug and alcohol testing, blood grouping tests on his bloodstained clothes, and gun powder residue testing. The state's testing, especially the blood grouping tests, was largely inconclusive, and even if defendant had been able to rebut it, no reasonable probability exists that the result of the proceeding would have been different.

Fourth, defendant argues that his counsel failed to make proper motions and legal objections. Some of his claims clearly show no prejudice, such as failure to exclude the victim's relatives from the courtroom and failure to object to identification of the gun found in defendant's possession. We have rejected his other arguments on the merits; therefore, defendant has shown no prejudice. These are: failure to object to irrelevant and prejudicial evidence, such as the alleged victim impact statements and failure to object to hearsay used to establish chain of custody. Also, in view of our reversal of defendant's manslaughter conviction, we need not address his argument that his lawyer should have moved to dismiss the manslaughter charge based on the nonviability of the fetus.

Defendant makes several other arguments, but again fails to show prejudice resulting from the alleged errors. He complains that his attorney failed to move to continue the trial when confronted with surprise testimony. This alleged surprise testimony consisted of statements that the knife found in the victim's truck may have inflicted the fatal wounds and testimony attempting to show that the bloody footprint was made by the killer, and not by someone who discovered the body later. Even if defendant had been granted a continuance and presented testimony in rebuttal, we find no reasonable probability that the outcome of the proceeding would have been different. Likewise, defendant has utterly failed to show that he has been prejudiced by the filing of "bare bones" pretrial motions.

Defendant also contends that his attorney should have cross-examined a sheriff's I.D. technician, called by the state, regarding her report that she had photographed a revolver at the crime scene. Defendant argues that this line of cross-examination would have substantiated his theory that the gun was planted on him by law enforcement agents. We again find that defendant has failed to show prejudice, and note that he merely seeks to exploit a simple error made by the technician, who actually photographed a revolver case. Finally, defendant contends that his attorney erred by failing to call the rule 11 doctors to testify that he lacked understanding of his *Miranda* rights. We have previously rejected this claim on the merits and found his waiver knowing, voluntary, and intelligent, so we do not accept his contention of ineffective assistance of counsel on this basis.

Defendant's final contentions relating to failure to make proper legal objections merit further discussion. He claims that his attorney's failure to move to suppress defendant's confession and the revolver found on his person based on an unlawful detention constituted ineffective assistance of counsel. We reject this argument on the merits. The Southern Pacific Railroad police arrested defendant for trespassing on railroad property. They turned him over to the Border Patrol, along with a group of about 15 other trespassers, because the circumstances of their apprehension made it likely that they were in the United States illegally. The arrest was clearly valid, and counsel's failure to move to suppress was reasonable. We find no prejudice to defendant.

■ Defendant also challenges his counsel's failure to move to dismiss for destruction of evidence. Apparently defendant's clothing was not refrigerated until it arrived at the laboratory for testing, approximately two months after the murder. The results of blood grouping tests were inconclusive. They indicated that human blood was present, but did not show whether the source of the blood was the victim or defendant, because they had similar blood types. However, testimony adduced at trial shows that the reason no further genetic marker testing could be performed was because of the small size of the bloodstains and the dirty condition of the clothing—not because of a lack of refrigeration. Again, defendant has failed to show prejudice.

Fifth, defendant challenges his counsel's failure to adequately investigate the source of the anonymous exculpatory letter that was discovered shortly before sentencing. The letter carried no postmark or signature, and it is unclear what further steps Ms. Kettlewell could have taken to investigate its origin. Defendant has completely failed to show prejudice, and we reject his claim of ineffective assistance of counsel.

### 11. *Failure to Appoint Experts for Rule 32 Hearing*

Defendant contends that the trial court's refusal to appoint experts, as requested in his rule 32 petition, denied his right to effective assistance of counsel, constituted unconstitutional discrimination based on indigency, and violated A.R.S. § 13–4013. Section 13–4013(B) provides:

> When a person is charged with a capital offense the court may on its own initiative and shall upon application of the defendant and a showing that the defendant is financially unable to pay for such services, appoint such investigators and expert witnesses as are reasonably necessary adequately to present his defense at trial and at any subsequent proceeding. Compensation for such investigators and expert witnesses shall be such amount as the court in its discretion deems reasonable and shall be paid by the county.

As part of his rule 32 petition, defendant moved for appointment of experts to evaluate the forensic evidence offered by the state, as well as his mental condition.

■ Whether additional experts are reasonably necessary is a decision within the sound discretion of the trial court. Absent substantial prejudice to defendant, we will not disturb that decision. *Clabourne,* 142 Ariz. at 342, 690 P.2d at 61. Defendant's principal contention is that the refusal to appoint experts prevented him from demonstrating that he was denied effective assistance of counsel. We have rejected that claim. He also sought the appointment of mental health experts to perform additional testing. We have determined that the rule 11 examination was adequate to assure defendant's competency to stand trial. Defendant requested experts to refute the state's forensic and serological evidence, which was largely inconclusive, and the requested experts would have merely developed impeachment testimony. Evidence that merely impeaches or contradicts trial testimony that was inconclusive on the issue of defendant's guilt would not support a finding of substantial prejudice where, as here, there is overwhelming independent evidence of culpability. In view of the overwhelming evidence of defendant's guilt, principally his confession, we hold that he has failed to show substantial prejudice. The trial court did not abuse its discretion by refusing to appoint additional experts.

### 12. *Limitation on Length of Appellate Brief*

■ Defendant initially submitted a 164–page brief to this court. Because our rules generally limit the length of briefs to 30 pages if printed, and 40 pages if typed, defendant moved to file an oversized brief. We granted the motion, but ordered that the brief submitted not exceed 120 pages. *See* rule 31.13, Arizona Rules of Criminal Procedure.

When filed, defendant's brief contained an additional argument—that the court-mandated editing violated his due process right to effective representation under the

United States and Arizona Constitutions. He contends that the 120–page limit resulted in choppy and incomplete arguments. We note that this court was able to address the 21 arguments submitted by defendant under 11 issues, reflecting our belief that the brief could have withstood further editing without compromising the quality of its arguments.

Defendant is clearly entitled to a meaningful opportunity to be heard under the requirements of due process. He was permitted to file a brief more than twice the size normally accepted, to file a 34–page reply brief, and to engage, through his counsel, in oral argument before this court. No more is constitutionally required. Additionally, the page limitation did not deny defendant his right to effective representation, because all arguable issues were raised and analyzed in the brief submitted. We hold that the court-mandated editing of defendant's appellate brief did not violate his constitutional rights. *See State v. Brown,* 397 N.W.2d 689, 700–01 (Iowa 1986).

## CONCLUSION

We have searched the record for fundamental error pursuant to A.R.S. § 13–4035, *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *State v. Leon,* 104 Ariz. 297, 451 P.2d 878 (1969), and found none. Defendant's manslaughter conviction is reversed and remanded for further proceedings. The convictions and sentences on all other counts are affirmed.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and MOELLER, JJ., concur.